Christopher Sproul (State Bar No. 126398)
Jodene Isaacs (State Bar No. 226895)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376, (510) 847-3467
Facsimile: (415) 358-5695
Email:  csproul@enviroadvocates.com
Email:  jisaacs@enviroadvocates.com

Fredric Evenson (State Bar No. 198059)
ECOLOGY LAW CENTER
P.O. Box 1000
Santa Cruz, CA 95061
Telephone: (831) 454-8216
Email: evenson@ecologylaw.com

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION,<br><br>Plaintiff,<br>v.<br><br>MAD RIVER LUMBER, LLC and TAP VENTURES, LLC<br><br>Defendants. | Civil Case No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et. seq.) |

Ecological Rights Foundation ("EcoRights"), by and through its counsel, hereby alleges:

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. section 1251 *et seq.* (the "Clean Water Act" or the "CWA"). This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. section 1331 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On May 11, 2017, EcoRights provided notice of violations of the CWA occurring at the Mad River Lumber log deck facility located at Assessor's Parcel Number ("APN #") 507-081-051 adjacent to West End Road in Arcata, California ("the Facility" or "the Log Deck") and of EcoRights' intention to file suit against Mad River Lumber, LLC and Tap Ventures, LLC (collectively "Mad River Lumber") to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Executive Director of the California State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Region 1 ("Regional Board"); the U.S. Attorney General, and the Defendants ("Notice Letter") as required by the CWA, 33 U.S.C. § 1365(b)(1)(A). A copy of this Notice Letter is attached to this complaint as Exhibit 1.

3.      More than sixty days have passed since notice was sent to Mad River Lumber and the state and federal agencies. Neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Northern District of California pursuant to CWA section 505(c)(1), 33 U.S.C. §1365(c)(1), because the source of the violations is located within this judicial district.

## II.     INTRADISTRICT ASSIGNMENT

5.      Intradistrict assignment of this matter to the San Francisco Division or Humboldt

Division of the Court is appropriate pursuant to Civil Local Rule 3-2(c). The events and the property at issue which give rise to EcoRights' claims occurred in Arcata, Humboldt County, California. However, Plaintiff's and Defendants' counsel is located in the greater San Francisco Bay Area. Thus, it would likely be most convenient for the parties if this case were assigned to the San Francisco Division of the Court.

### III.  <u>INTRODUCTION</u>

6.    This complaint seeks relief for alleged unlawful discharges of pollutants from Mad River Lumber facility located on APN 507-081-051 adjacent to West End Road in Arcata, California into waters of the United States in violation of the Clean Water Act, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, adopted by California State Water Resources Control Board ("SWRCB"), Water Quality Order No. 2014-0057-DWQ ("2015 Industrial Storm Water Permit" or " WQO-2014-0057-DWQ"), which became effective July 1, 2015, and the previous version of the Industrial Stormwater Permit, Water Quality Order No. 97-03-DWQ ("1997 Industrial Storm Water Permit" or "WQO-97-03-DWQ").

7.    Violations of the Clean Water Act and the Industrial Stormwater Permit by small industrial sites are recognized as a leading cause of significant, cumulative impacts to water quality. With every rainfall event, hundreds of millions of gallons of polluted rainwater flow off of local industrial facilities, such as Mad River Lumber's, and pour into storm drains, rivers, and the ocean. The consensus among agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering the marine environment each year.

8.    Stormwater runs off of industrial sites such as Mad River Lumber's, causing harm to humans and aquatic life. In particular, stormwater from such industrial facilities contains suspended sediment and chemicals that are potentially significant to the beneficial uses of Humboldt Bay.

9.    Mad River Lumber's stormwater discharges contribute to the ongoing stormwater pollution problem and exemplify the epidemic of violations of industrial stormwater permits that EcoRights is seeking to eliminate or reduce. These pollution discharges can and must be curtailed to ensure the ecological health of the Humboldt Bay.

### IV.  <u>PARTIES</u>

10.    EcoRights is a non-profit public benefit corporation organized under the laws of California, with its main office in Garberville, California. EcoRights' purpose is to educate the public about environmental practices which cause harm to human health, the environment and other natural resources, and to seek redress from those harms through litigation or alternative dispute resolution. EcoRights represents citizens in protecting California's waterways from pollution, securing the multitude of benefits that flow from clean, vibrant waters: safe drinking water, abundant and diverse wildlife populations, healthy recreational opportunities, and economic prosperity from commercial fishing, tourism, and other commercial activities that depend on clean water. To further its goals, EcoRights actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

11.    Members of EcoRights, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate near the Humboldt Bay, into which Mad River Lumber causes pollutants to be discharged. These EcoRights members use and enjoy the impacted waters for recreational, educational, scientific, conservation, aesthetic, and spiritual purposes. Mad River Lumber's alleged discharge of stormwater containing pollutants impairs each of those uses. Thus, the interests of EcoRights' members have been, are being, and will continue to be adversely affected by Mad River Lumber's failure to comply with the Clean Water Act and the Industrial Stormwater Permit.

12.    Mad River Lumber, LLC and Tap Ventures, LLC are the owner, corporate parent of, or otherwise exercise control over the Facility located on APN 507-081-051 adjacent to West End Road in Arcata, California. Mad River Lumber, LLC and Tap Ventures, LLC are actively registered with the California Secretary of State.

13.    Through its various corporate or subsidiary entities, Mad River Lumber operates the Log Deck Facility where it sorts and stores logs, debarks them and stores them until they are ready to ship to Mad River Lumber's lumber mill and retail store located at 2935 St Louis Road, Arcata, California.

## V.    <u>REGULATORY BACKGROUND</u>

**Clean Water Act**

14.    CWA section 301(a), 33 U.S.C. §1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA sections. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

15.    CWA section 402(p) requires that NPDES permits be issued for stormwater discharges associated with industrial activities. CWA section 402(b) allows each state to administer its own EPA-approved permit program for discharges. In California, the State Board and its nine Regional Boards have approval from EPA to administer an NPDES permit program for the State. The State Board and its nine Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

16.    CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. § 1362(5).

17.    The CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger is in compliance with the terms of a NPDES permit. CWA § 301(a), 33 U.S.C. § 1311(a); see also CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities). The Facility discharges stormwater associated with industrial activity to the Humboldt Bay, and that stormwater is contaminated with pollutants. Prior to July 2017, the Facility failed to obtain authorization to discharge stormwater associated with industrial activities pursuant to either the 1997 and 2015 Industrial Stormwater Permits. Each of these permit terms constitutes an "effluent limitation" within the meaning of CWA § 505(f), 33 U.S.C. § 1365(f). The Facility's stormwater discharges have violated various of these permit terms, thereby violating CWA effluent limitations. CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33 U.S.C. § 1365(a). CWA violators are also subject to an assessment of civil penalties of up to $37,500 per day per violation for violations occurring between January 12, 2009 and November 1, 2015. Violations that occur

after November 2, 2015 may be subject to civil penalties in the amount of $51,570 per day. CWA § 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1 - 19.4.

**State Regulations**

18.    The Regional Board's Basin Plan is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region. Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses. The Basin Plan sets forth narrative water quality objectives for sediment, settable matter, and suspended materials, as well as narrative objectives for not impairing water quality with oil sheens, turbidity, or other nuisance conditions. The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objective for certain pollutants of concern. The Basin Plan, Section 3, establishes the following relevant Water Quality Standards (also known as Water Quality Objectives) for the Humboldt Bay[1]:

a.    Controllable water quality shall conform to the water quality objectives contained therein.

b.    Dissolved oxygen levels shall be a minimum of 6.0 mg/L [6,000 ug/L].

c.    The suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses.

d.    Waters shall not contain substances in concentrations that result in deposition of material that causes nuisance or adversely affect beneficial uses.

e.    Turbidity shall not be increased more than 20 percent above naturally occurring background levels.

f.    Waters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses.

---

[1] The Basin Plan is published by the California North Coast Regional Water Quality Control Board at http://www.waterboards.ca.gov/northcoast/water_issues/programs/basin_plan/basin_plan.shtml.

g.      Waters shall be free of coloration that causes nuisance or adversely affects beneficial uses.

h.      Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

i.      All waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life.

19.    Discharges of stormwater from the Facility have caused or contributed to an exceedance of the above-listed Water Quality Standards. These discharges (and all discharges referred to in the Notice Letter attached as Exhibit 1) have occurred from at least one discharge location that drains from the Facility to Janes Creek, a tributary to Humboldt Bay.

20.    Exhibit 1 (i.e. Plaintiff's May 11, 2017 Notice Letter and its Attachments 1 and 2) include monitoring data reflecting Ecorights' sampling of Mad River Lumber's stormwater discharges. Ecorights alleges that the sample results reflected in Exhibit 1, Attachment 1 are representative of the pollutant levels in the Facility's discharge of stormwater, including such discharges that Mad River Lumber did not sample or analyze. Thus, every instance when the Facility has discharged stormwater, including instances when the Facility has discharged stormwater that it has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Attachment 1. As reflected in Attachment 1, the Facility's stormwater discharges to the Humboldt Bay have consistently contained elevated levels of the following pollutants: TSS, pentachlorophenol, and tannins and lignins.

21.    The excessive TSS and tannins and lignins in the Facility's stormwater discharges has caused or contributed and is continuing to cause or contribute to the Humboldt Bay not meeting the Water Quality Standards set forth in the Basin Plan objectives described above. Furthermore, EcoRights alleges that the Facility's discharge of stormwater containing suspended and settleable toxic materials including pentachlorophenol has contributed to the deposition and/or dispersal of materials that interfere with beneficial uses of the Humboldt Bay and a detrimental increase in concentrations of toxic substances found in bottom sediments or aquatic life due to bioaccumulation, and thus has caused or contributed and is continuing to cause or contribute to the

Humboldt Bay not meeting the Water Quality Standards above.

22.    In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR") sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries.[2] The CTR, which applies to Humboldt Bay, includes limits for pentachlorophenol and dioxin congeners. EcoRights sampling demonstrates that pentachlorophenol is being discharged in the Facility's stormwater. As pentachlorophenol is invariably contaminated with dioxins, where pentachlorophenol is found, dioxins will persist. EcoRights therefore alleges that stormwater discharges from the Facility which contain pentachlorophenol therefore also contain dioxins.

**The General Industrial Stormwater Permit**

23.    In California, the State Board has elected to issue a single, statewide general permit applicable to all stormwater discharges associated with industrial activity. The Industrial Stormwater Permit is an NPDES permit pursuant to CWA section 402(p), 33 U.S.C. § 1342(p). To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Industrial Stormwater Permit and comply with its terms or obtain and comply with an individual NPDES permit.

24.    The Effluent Limitations of the 1997 and 2015 Industrial Stormwater Permits, (WQO-2014-0057-DWQ §§ V.A., X.H.1, X.H.2.; WQO-97-03-DWQ § B.3.; *see also* WQO-2014-0057-DWQ, Industrial General Permit Fact Sheet § D.1-5.), requires that dischargers implement best management practices ("BMPs") that constitute Best Available Technology Economically Achievable ("BAT") and the Best Conventional Pollutant Control Technology ("BCT") as the means to reduce or prevent discharges of pollutants.

25.    The Discharge Prohibitions of the 1997 and 2015 Industrial Stormwater Permits prohibit stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. WQO-97-03-DWQ § A.2; WQO-2014-0057-DWQ § III.C. The Receiving Water Limitations of the 1997 and 2015 Industrial Stormwater Permits also prohibit stormwater discharges that cause or

---

[2] The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31682.

contribute to an exceedance of any applicable Water Quality Standards in any affected receiving water. WQO-97-03-DWQ § C.2; WQO-2014-0057-DWQ § VI.A. Applicable Water Quality Standards are set forth in the Basin Plan and the CTR.

26.    The Receiving Water Limitations of the 1997 and 2015 Industrial Stormwater Permits also prohibit stormwater discharges that adversely impact human health or the environment. WQO-97-03-DWQ § C.1; WQO-2014-0057-DWQ § VI.B.

27.    The Receiving Water Limitations and Discharge Prohibitions of the 1997 and 2015 Industrial Stormwater Permits also prohibit stormwater discharges that contain pollutants in quantities that threaten to cause pollution or a public nuisance. WQO-97-03-DWQ § A.2; WQO-2014-0057-DWQ § VI.C.

28.    Dischargers must ensure that a Stormwater Pollution Prevention Plan ("SWPPP") is prepared in order to identify and evaluate all sources of pollutants that may affect the quality of industrial storm water discharges and authorized non-stormwater discharges ("NSWDs"). WQO-2014-0057-DWQ §§ X.C.1.A, X.G.2; WQO-97-03-DWQ §§ A.6, A.7.

29.    The SWPPP must describe each industrial process and the "type, characteristics, and approximate quantity of industrial materials used in or resulting from" industrial processes. WQO-2014-0057-DWQ § X.G.1.A; WQO-97-03-DWQ § A.6.a.i. Dischargers must also ensure that the SWPPP describes all activities that generate a significant amount of dust, particulates, or other pollutants that may be deposited within the facility boundaries, including the locations, sources, and characteristics of the dust or particulate pollution. WQO-2014-0057-DWQ § X.G.2; WQO-97-03-DWQ § A.6.

30.    For facilities that discharge to impaired waters, the SWPPP must identify pollutants at their facility that may be causing or contributing to an exceedance of a water quality standard in the receiving waters. WQO-2014-0057-DWQ § X.G.2. Based on the potential pollutant assessment, the SWPPP must further identify any areas of the facility where the minimum BMPs required by the 1997 and 2015 Industrial Stormwater Permits will not adequately reduce or prevent pollutants. WQO-2014-0057-DWQ § X.G.2; WQO-97-03-DWQ § A.6.

31.    The 1997 and 2015 Industrial Stormwater Permits further requires that dischargers develop, implement, and update and revise a SWPPP which minimizes the discharge of pollutants to a level commensurate with application of the BAT and BCT. WQO-97-03-DWQ § B.3; WQO-2014-0057-DWQ §§ V.A., X.H.1, X.H.2.

32.    Dischargers are also required to implement a monitoring plan to visually monitor each facilities' discharge locations as well as collect and analyze stormwater discharges throughout each wet season. WQO-97-03-DWQ §§ B.1, E.3; WQO-2014-0057-DWQ § XI.

## VI.    STATEMENT OF FACTS

33.    In most of the Humboldt Bay area, stormwater drains untreated either directly, or through the storm drain system, into the Bay and its tributaries. Among those who specialize in the field of water quality, it is well known and commonly understood that stormwater pollution accounts for the majority of pollution entering the Humboldt Bay and its watershed each year. With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from area industries, pour into the Bay and its tributaries.

34.    The CWA specifies that the discharge of any pollutant is unlawful except in compliance with specified CWA provisions. See 33 U.S.C. §1311(a). The CWA and its implementing regulations require any person who discharges or proposes to discharge pollutants into waters of the United States in California to submit a National Pollutant Discharge Elimination System ("NPDES") permit application to the State Water Resources Control Board ("State Board").  40 C.F.R. § 122.21(a) ["Duty to Apply"], §122.26(a)(ii) ["Permit Requirement"]; 33 U.S.C. § 1342(p)(2)(b).  Further, dischargers of storm water associated with industrial activity are required to obtain either an individual NPDES permit or seek coverage under the State Board General Permit. See 40 C.F.R. § 122.26(c)(1). The 1997 and 2015 General Permits require existing facilities subject to its terms, such as the Facility, to file a Notice of Intent ("NOI") for coverage under the General Permit and to thereafter comply with its procedural and substantive requirements. Any violation of the 1997 or 2015 General Permits or its terms is a violation of the CWA.

35.    The Mad River Lumber Log Deck operations include log skidding and storage,

debarking, and wood byproduct recovery. Upon information and belief, the Facility currently obtains unprocessed logs for the purposes of storing, sorting, and/or prepation for milling, including debarking. Logs are transported to the Log Deck by trucks, and are then loaded and sorted in large stockpiles for holding until they can be processed and cut at Mad River Lumber's Mill Site located at 2935 St. Louis Road, Arcata less than a mile away from the Facility. Logs are trucked in and off-loaded using a log loader or log skidder. The main entrance to the facility from West End Road which cuts through the West End Industrial Park. Log trucks, service trucks and vehicles, and employee vehicles use the access road within the Industrial Park to enter the Facility.

36.    The Log Deck is part of a former sawmill and plywood manufacturing facility, previously in operation for decades as the Mad River Industrial Complex and operated by various entities, including Simpson Timber, Weyerhauser, Humboldt Flakeboard Panels, Louisiana-Pacific, and Britt Lumber. In the 1990s, portions of the Mad River Industrial Complex were investigated to determine the extent of contamination related to the use of a wood preservative known as Woodlife, which contained pentachlorophenol. Pentachlorophenol had been widely used as a wood preservative until its use was restricted in 1987 due to its toxicity. Many by-products are created during the production of pentachlorophenol including polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans (collectively referred to herein as "dioxins"). Dioxins are a group of chemical compounds that are highly toxic and persist in the environment for decades. As pentachlorophenol based wood preservatives are invariably contaminated with dioxins, where pentachlorophenol is found, dioxins will persist. Dioxins are typically hydrophobic and adsorb to organic material in soils and sediments, however, they are highly mobile in the water column when hydrocarbons (such as gasoline and diesel) are present.

37.    Records indicate that the Facility previously housed a saw mill, log and/or waste pond. In addition, aerial photographs from as recently as 2003 indicates that a conical burner (teepee burner) was likely located at the Facility, suggesting that pentachlorophenol and dioxins are present as a result of burning wood waste and/or wood waste treated with preservatives. Although nearby groundwater monitoring revealed pentachlorophenol contamination in shallow

groundwater wells, this Facility or the adjacent Mad River Industrial Complex has not been remediated for pentachlorophenol, dioxin, or furan contamination. With each rain event, stormwater runs across the property, including the former site of the conical burner, and discharges into Janes Creek along with plumes of sediment.

38.    Janes Creek is an approximately five mile long freshwater tributary that flows into McDaniel Slough, a tributary into northern Humboldt Bay. Janes creek is adjacent to the southeastern border of the site and receives stormwater discharges directly from the Facility via a culvert. Janes Creek supports several species of anadromous fish which are protected under the Endangered Species Act ("ESA", 16 U.S.C. §1531 et seq.), including coho salmon, steelhead trout, and green sturgeon which have all been listed as a "threatened" species pursuant to the ESA by NMFS. *See* 50 CFR 223.102 (federal register listing date of threatened and endangered species), 71 Fed. Reg. 834 (2006) (Northern California Distinct Population segment steelhead (hereinafter "steelhead") listing); 70 Fed. Reg. (June 28, 2005) (coho salmon listing); 71 Fed. Reg. 17757 (April 7, 2006) and 75 FR 30714 (July 2, 2010) (green sturgeon listing and habitat designation). In addition to ESA threatened species, Janes Creek also supports coastal cutthroat trout, sticklebacks, Pacific lamprey, and other aquatic resources. The recent removal of a former tide gate in McDaniel Slough allows coho salmon, steelhead, and other salmonids to use Janes Creek more frequently since there is no longer a part-time barrier to their movement. However, sediment loading into Janes Creek and other tributaries to Humboldt Bay continue to negatively impact anadromous fish habitat making recovery of these species difficult. In addition, salmonid species are particularly sensitive to the toxic effects of dioxins, which creates significant reproductive problems. Ongoing discharges of stormwater containing dioxins into the Bay and its tributaries continues to impede recovery of coho salmon, steelhead trout, and green sturgeon.

39.    The types of pollutants that the Facility is known to release into the immediate environment include: TSS, pentachlorophenol, dioxins, and tannins and lignins. The Facility is entirely unpaved. Thus, pollutants from Mad River Lumber's activities can soak into unpaved ground and later become mobilized in stormwater flows that are directed into Janes Creek.

40.    High concentrations of TSS in the Facility's stormwater degrades optical water quality in

receiving waters by reducing water clarity and decreasing light available to support photosynthesis. Suspended solids have been shown to alter predator-prey relationships (for example turbid water might make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and PAHs, are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments.

41.    The Facility also generates large amounts of wood waste and other particulate matter which settle on the ground and other surfaces which are exposed to storm water and non-storm water flows. A process known as "wood yard leaching" occurs when the by-products of chemical and biological decomposition of wood materials are carried away by water and is believed to occur at the Facility. The soluble or misable products of wood leaching include tannins, lignins, turpins, high chemical oxygen demand and biochemical oxygen demand, and in some cases "black liquor" from fermentation.

42.    The Facility lacks sufficient and/or sufficiently well-maintained berms or other structural controls to retain stormwater on the Facility. Mad River Lumber does not sufficiently treat contaminated stormwater prior to discharge from the Facility. The large number of trucks entering and leaving the Facility also track dirt, metals, oil, grease, and other pollutants off-site and onto public roads and drainage pathways where rainfall washes these pollutants into the storm drain system or directly into waters of the United States.

43.    The industrial activities conducted at the Facility falls under SIC Code 2411 – Logging, which is described by U.S Environmental Protection Agency as establishments that conduct log storage and handling. Although the Facility has been operating for more than a decade, Mad River Lumber did not obtain authorization to discharge stormwater in compliance with the terms of the 2015 General Permit until July 2017, nearly 60 days after EcoRights sent their Notice Letter. Plaintiffs allege that Mad River Lumber failure to comply with the substantive requirements of the 1997 and 2015 Industrial Stormwater Permits as discussed further below are ongoing despite their recent authorization to discharge stormwater.

**Activities Contributing to CWA Violations**

44.    Mad River Lumber did not received authorization from the State of California to discharge stormwater associated with industrial activities into waters of the United States until July 2017.

45.    Mad River Lumber has not developed and/or implemented an adequate SWPPP at the Facility.

46.    Mad River Lumber has not implemented BMPs that adequately minimize the exposure of pollutants at the Facility to stormwater.

47.    Mad River Lumber has not implemented BMPs at the Facility that adequately control and minimize contaminated runoff from the facility.

48.    Mad River Lumber has not implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge.

49.    Mad River Lumber has not developed and/or implemented an adequate monitoring program, also referred to as the Monitoring Implementation Plan ("MIP") in the 2015 Industrial Stormwater Permit, at the Facility.

50.    Mad River Lumber has failed to complete all of the stormwater sampling required by the 1997 and 2015 Industrial Stormwater Permits at the Facility.

51.    Due to Mad River Lumber's lack of effective pollution prevention measures, its failure to implement effective best management practices, and its failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents as described above. This polluted stormwater has been and will continue to be discharged into Humboldt Bay.

52.    EcoRights stormwater sampling indicates that Mad River Lumber's discharges of stormwater from the Facility is consistently contaminated with higher levels of pollutants than is permissible under the Industrial Stormwater Permit.

**VII.  CLAIMS**

**FIRST CLAIM FOR RELIEF**

**Discharges of in Violation of Technology-Based Effluent Limitations
(Violations of 33 U.S.C. § 1311)**

53.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

54.    The CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger is in compliance with the terms of a NPDES permit. CWA § 301(a), 33 U.S.C. § 1311(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities). The Facility discharges stormwater associated with industrial activity to Humboldt Bay that is contaminated with pollutants. The Facility's past and present stormwater discharges are subject to the 1997 and 2015 Industrial Stormwater Permits, which authorize these discharges conditioned on the Facility complying with the terms of those permits. Each of these permit terms constitutes an "effluent limitation" within the meaning of CWA section 505(f), 33 U.S.C. § 1365(f). The Facility's stormwater discharges have violated numerous of these permit terms, thereby violating CWA effluent limitations.

55.    The Effluent Limitations of the 1997 and 2015 Industrial Stormwater Permits prohibit Mad River Lumber from discharging pollutants above the level commensurate with the application of BAT and BCT. WQO-97-03-DWQ § B.3; WQO-2014-0057-DWQ §§ V.A., X.H.1, X.H.2; (see also WQO-2014-0057-DWQ, Industrial General Permit Fact Sheet § D.1-5.)

56.    On every day prior to July 1, 2015 that Mad River Lumber discharged stormwater from the Facility, it was in violation of the 1997 Industrial Stormwater Permit's Receiving Water Limitations and Discharge Prohibitions set forth at WQO-97-03-DWQ §§ A.2, C.1, & C.2 by causing or contributing to exceedances of water quality standards. Each day after July 1, 2015 that Mad River Lumber discharged stormwater from the Facility, it acted in violation of the 2015 Industrial Stormwater Permit's Receiving Water Limitations set forth at WQO-2014-0057-DWQ §§, VI.A., B. & C by causing or contributing to exceedances of water quality standards and causing pollution problems as described above. Mad River Lumber has been discharging polluted stormwater from the Facility containing levels of pollutants above the level commensurate with the application of BAT and BCT in violation of the Effluent Limitations of the Industrial Stormwater Permit during every significant rain event (defined by the U.S. EPA as a rainfall event generating

0.1 inches or more of rain). Significant local rain events are reflected in the rain gauge data available at http://cdec.water.ca.gov and http://lwf.ncdc.noaa.gov/oa/ncdc.html. Attachment 2 to the Notice Letter, i.e. Exhibit 1 to this complaint, sets forth a table reflecting the rainfall data for the past five years, as reported to the Arcata-Eureka Airport Station, the closest monitoring station available on the NOAA website.

57.    The EPA and the State Board have published Benchmark Values set at the maximum level of pollutant loading generally expected if an industrial facility is employing BAT and BCT (which are set forth in Attachment 1 to Exhibit 1). As reflected in Attachment 1 to Exhibit 1, the Facility has discharged stormwater containing pollutant levels exceeding Benchmark Values, which establishes that the Facility has discharged pollutants above a level commensurate with application of BAT and BCT. The sample results reflected in Attachment 1 are representative of the pollutant levels in the Facility's discharge of stormwater, including such discharges that Mad River Lumber did not sample or analyze. Thus, every instance when the Facility has discharged stormwater, including instances when the Facility has discharged stormwater that it has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Attachment 1.

58.    EcoRights representatives have observed turbid, brown-tinged stormwater discharges as well as discharges containing sheens from the Facility on numerous occasions between December 2015 and March of 2017. BAT and BCT levels of treatment at the Facility would necessarily be sufficient to prevent the discharge of discolored, turbid wastewater that appears to contain elevated levels of TSS and/or hydrocarbons. Thus, the presence of such discoloration in the stormwater discharges further establishes that Mad River Lumber has discharged and is continuing to discharge stormwater that is not treated to a level commensurate with application of BAT and BCT. EcoRights alleges that the stormwater discharges EcoRights observed is representative of the stormwater discharges generally and thus every day Mad River Lumber has discharged stormwater (*i.e.*, during every significant rain event), Mad River Lumber has discharged stormwater with levels of pollutants exceeding that which would be present if Mad River Lumber employed BAT and BCT treatment. Unlawful discharges of stormwater from the Facility with levels of pollutants

1  exceeding BAT and BCT levels of control continue to occur presently and will occur in the future
2  during all significant rain events.

3      59.    Each discharge of stormwater from the Facility after the effective date of the Industrial
4  Stormwater Permit has constituted and will constitute a separate violation of the Industrial
5  Stormwater Permit's Effluent Limitations and the CWA. Every day since at least five years and
6  sixty days before the date Plaintiff filed this Complaint that Mad River Lumber has discharged or
7  will discharge polluted stormwater from the Facility in violation of the Effluent Limitations of the
8  Industrial Stormwater Permit, WQO-97-03-DWQ § B.3; WQO-2014-0057-DWQ §§ V.A., X.H.1,
9  X.H.2, is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which
10  subjects Mad River Lumber to an assessment of civil penalties pursuant to CWA sections 309(d)
11  and 505, 33 U.S.C. §§ 1319(d) and 1365.

12

13                          **SECOND CLAIM FOR RELIEF**

14          **Discharges of in Violation of Water Quality-Based Effluent Limitations**
                        **(Violations of 33 U.S.C. § 1311)**
15

16      60.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as though
17  fully set forth herein.

18      61.    The Discharge Prohibitions of the 1997 and 2015 Industrial Stormwater Permits prohibit
19  stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. WQO-
20  97-03-DWQ § A.2; WQO-2014-0057-DWQ § III.C. The Receiving Water Limitations of the 1997
21  and 2015 Industrial Stormwater Permits also prohibit stormwater discharges that cause or contribute
22  to an exceedance of any applicable Water Quality Standards in any affected receiving water. WQO-
23  97-03-DWQ § C.2; WQO-2014-0057-DWQ § VI.A. The Receiving Water Limitations of the 1997
24  and 2015 Industrial Stormwater Permits also prohibit stormwater discharges that adversely impact
25  human health or the environment. WQO-97-03-DWQ § C.1; WQO-2014-0057-DWQ § VI.B. The
26  Receiving Water Limitations or the Discharge Prohibitions of the 1997 and 2015 Industrial
27  Stormwater Permits also prohibit stormwater discharges that contain pollutants in quantities that
28  threaten to cause pollution or a public nuisance. WQO-97-03-DWQ § A.2; WQO-2014-0057-DWQ

1    § VI.C.

2        62.    Applicable Water Quality Standards are set forth in the Basin Plan and the CTR.

3        63.    The Basin Plan, *inter alia*, establishes the following Water Quality Standards for the

4    Humboldt Bay:

5            a.    Controllable water quality shall conform to the water quality objectives

6    contained therein.

7            b.    Dissolved oxygen levels shall be a minimum of 6.0 mg/L [6,000 ug/L].

8            c.    The suspended sediment load and suspended sediment discharge rate of

9    surface waters shall not be altered in such a manner as to cause nuisance or adversely

10   affect beneficial uses.

11           d.    Waters shall not contain substances in concentrations that result in deposition

12   of material that causes nuisance or adversely affect beneficial uses.

13           e.    Turbidity shall not be increased more than 20 percent above naturally

14   occurring background levels.

15           f.    Waters shall not contain oils, greases, waxes, or other materials in

16   concentrations that result in a visible film or coating on the surface of the water or on

17   objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses.

18           g.    Waters shall be free of coloration that causes nuisance or adversely affects

19   beneficial uses.

20           h.    Waters shall not contain suspended material in concentrations that cause

21   nuisance or adversely affect beneficial uses.

22           i.    All waters shall be maintained free of toxic substances in concentrations that

23   are toxic to, or that produce detrimental physiological responses in human, plant, animal,

24   or aquatic life.

25       64.    Mad River Lumber's discharges of stormwater from the Facility have caused or

26   contributed to exceedances of the above-listed Water Quality Standards. The sample results

27   reflected in Attachment 1 are representative of the pollutant levels in the Facility's discharge of

28   stormwater, including such discharges that Mad River Lumber did not sample or analyze.

EcoRights has visually observed discharges of stormwater from the Facility that were turbid, murky, visibly discolored, and containing sheens. EcoRights alleges that the stormwater discharges EcoRights observed and sampled are representative of Mad River Lumber's stormwater discharges generally and thus every day that Mad River Lumber has discharged stormwater, Mad River Lumber has discharged stormwater that causes the Humboldt Bay and its tributaries to fail to meet these Basin Plan water quality standards.

65.    The levels of these pollutants in the Facility's stormwater discharges have caused pollution, contamination, or nuisance in violation of the Discharge Prohibitions of the Industrial Stormwater Permit, WQO-97-03-DWQ § A.2; WQO-2014-0057-DWQ § III.C, and have adversely impacted the environment in violation of the Receiving Water Limitations of the Industrial Stormwater Permit, WQO-97-03-DWQ § C.2; WQO-2014-0057-DWQ § VI.A. Moreover, the discharge of these pollutants has caused the Humboldt Bay not to attain or contributed to these waters not attaining one or more applicable Water Quality Standards in violation of the Receiving Water Limitations of the Industrial Stormwater Permit, WQO-97-03-DWQ § C.2; WQO-2014-0057-DWQ § VI.A.

66.    Each day that Mad River Lumber discharged stormwater from the Facility, that stormwater contained levels of pollutants matching the levels set forth in Attachment 1 to Exhibit 1 and thus caused levels of pollutants to exceed one or more of the applicable Water Quality Standards in the Humboldt Bay. Every day that the Facility has been in existence since the effective date of the above-referenced Water Quality Standards, which date back at least to 1986 in most instances, and to May 24, 2000 for the California Toxics Rule's limit on pentachlorophoenol, Mad River Lumber has discharged stormwater from the Facility during at least every significant local rain event over 0.1 inches that has caused or contributed to Water Quality Standards not being met in the Humboldt Bay. Significant local rain events are reflected in the rain gauge data available at http://cdec.water.ca.gov and http://lwf.ncdc.noaa.gov/oa/ncdc.html, and, as mentioned above, summarized in Exhibit 1, Attachment 2.

67.    Mad River Lumber's unlawful discharges from the Facility continue to occur presently

and will occur in the future during all significant rain events. Each discharge of stormwater from the Facility after the effective date of the Industrial Stormwater Permit has constituted and will constitute a separate violation of the Discharge Prohibitions of the Industrial Stormwater Permit, WQO-97-03-DWQ § A.2; WQO-2014-0057-DWQ § III.C, and/or the Receiving Water Limitations of the Industrial Stormwater Permit, WQO-97-03-DWQ § C.2; WQO-2014-0057-DWQ § VI.A, and the CWA. Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Mad River Lumber has discharged or will discharge polluted stormwater from the Facility in violation of Discharge Prohibitions of the Industrial Stormwater Permit and/or the Receiving Water Limitations of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Mad River Lumber to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

## THIRD CLAIM FOR RELIEF

### Failure to Develop and Implement an Adequate Stormwater Pollution Prevention Plan
### (Violations of 33 U.S.C. § 1311)

68.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

69.    Mad River Lumber has failed to develop and implement an adequate SWPPP or implement all necessary revisions to the SWPPP for the Facility as required by WQO-97-03-DWQ §§ A.1, C.1, WQO-2014-0057-DWQ § X.A-I, § X.B. Mad River Lumber has failed to prepare, maintain, revise and implement Mad River Lumber's SWPPP as required, as evidenced by failure to prepare one prior to July 2017 as well as stormwater discharges that exceed EPA and State benchmarks and contribute to violations of Water Quality Standards in receiving waters. Mad River Lumber 's SWPPP does not specify adequate BMPs designed to reduce pollutant discharge to BAT and BCT levels in accord with the SWPPP requirements set forth in the Industrial Stormwater Permit. WQO-97-03-DWQ, § A; WQO-2014-0057-DWQ §§ X.A., X.C., X.H.1, X.H.2.

70.    Prior to July 1, 2015, Mad River Lumber failed to comply with the SWPPP requirements

in the 1997 Industrial Stormwater Permit and/or Mad River Lumber failed to implement any SWPPP. Additionally, Mad River Lumber's present SWPPP fails to comply with the SWPPP requirements set forth in the 2015 Industrial Stormwater Permit and/or Mad River Lumber has failed since July 1, 2015 to implement its SWPPP as it fails to adequately control discharges of TSS, pentachlorophenol, dioxins, and tannins and lignins.

71. Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Mad River Lumber has failed to draft an adequate SWPPP, and/or to revise, and/or to implement an adequate SWPPP in violation of the requirements of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Mad River Lumber to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

## FOURTH CLAIM FOR RELIEF

### Failure to Develop and Implement an Adequate Monitoring and Reporting Program
### (Violations of 33 U.S.C. § 1311)

72. Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

73. Mad River Lumber has failed to develop and implement an adequate monitoring program and implement all necessary revisions to it as required by the 1997 and 2015 Industrial Stormwater Permits.

74. The 1997 Industrial Stormwater Permit required that the monitoring program provide for analysis of stormwater samples for TSS, pH, specific conductance, and total organic carbon ("TOC") or Oil and Grease. WQO-97-03-DWQ § B.5.c.i. Similarly, the 2015 Industrial Stormwater Permit requires that the MIP provide for analysis of stormwater samples for TSS, pH, and Oil and Grease. WQO-2014-0057-DWQ § XI.B.6. In addition, the 1997 and 2015 Industrial Stormwater Permits required that the monitoring program provide for analysis of stormwater samples for the other analytical parameters listed either in the 1997 Industrial Stormwater Permit under Table D or set out in the 2015 Industrial Stormwater Permit under Table 1.

75. In addition, the 1997 Industrial Stormwater Permits required that the monitoring program

provide for analysis of toxic chemicals and other pollutants that are "likely to be present" in the Facility's stormwater discharges. WQO-97-03-DWQ § B.5.c. Similarly, the 2015 Industrial Stormwater Permit § XI.B.6 requires facilities to sample for additional parameters that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment (§ X.G.2) which includes "pollutants likely to be present in industrial storm water discharges and authorized NSWDs" (§ X.G.2.a).

76.    Mad River Lumber has consistently lacked an adequate monitoring program and has failed to collect and analyze any stormwater samples. Mad River Lumber's current MIP is inadequate because it fails to consistently monitor for pollutants known to or likely to occur in stormwater discharges based on the historical industrial activities performed at the Facility. Given the former industrial uses at the site and general knowledge in the industry, dioxins, furans, and polycyclic aromatic hydrocarbons ("PAHs") are likely to be present in the Facility's stormwater discharges, as treated wood and wood pulp that was previously stored at the site was uncovered and exposed to the elements and ground. Thus, given the high level of pentachlorophenol found in the Facility's stormwater and historical activities at the site, the Facility's discharges are likely to contain dioxins, furans, and PAHs.

77.    As alleged in the preceding paragraphs, Mad River Lumber has not developed and implemented an adequate monitoring program. The monitoring Requirements of the 1997 and 2015 Industrial Stormwater Permits require dischargers to develop and implement a facility-specific monitoring program. WQO-97-03-DWQ §§ B.1, E.3; WQO-2014-0057-DWQ § XI. On each and every day from April 17, 1997 to June 30, 2015, Mad River Lumber was in continuous violation of the 1997 Industrial Stormwater Permit's requirements to develop and implement an adequate monitoring program. WQO-97-03-DWQ §§ B.1, E.3. Further, on each and every day since July 1, 2015, Mad River Lumber has been in continuous violation of the 2015 Industrial Stormwater Permit's requirements to develop and implement an adequate monitoring program. WQO-2014-0057-DWQ § XI. Mad River Lumber will continue to be in violation every day that Mad River Lumber fails to develop and implement an adequate monitoring program for the Facility.

78.    As further discussed above, Mad River Lumber has not submitted accurate and complete Annual Reports and reports of noncompliance with the 1997 and 2015 Industrial Stormwater Permits. Therefore, for each Annual Report due from April 17, 1997 to June 30, 2015, Mad River Lumber was in violation of the 1997 Industrial Stormwater Permit's requirements to submit accurate and complete Annual Reports every day since each of the Annual Reports were due. WQO-97-03-DWQ § B.14. Further, for each Annual Report due since July 1, 2015, Mad River Lumber was in violation of the 2015 Industrial Stormwater Permit's requirement's to submit accurate and complete Annual Reports every day since each of the Annual Reports were due. WQO-2014-0057-DWQ § XVI.

79.    Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Mad River Lumber has failed to prepare and implement an adequate monitoring program as required by WQO-97-03-DWQ §§ B.1, E.3 and WQO-2014-0057-DWQ § XI is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Mad River Lumber to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

80.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged in Plaintiff's First through Fourth Claims above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Mad River Lumber as set forth hereafter.

## VIII.  <u>RELIEF REQUESTED</u>

81.    Wherefore, EcoRights respectfully requests this Court to grant the following relief:

a.    Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of any permit issued pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all substantive and procedural requirements of the Industrial Stormwater Permit and the CWA;

b.    Enjoin Defendants from discharging pollutants from its Facility to the Humboldt Bay;

c.    Enjoin Defendants to restore all receiving waters damaged by Defendant's illegal

discharges of pollutants from the Facility;

d. Enjoin Defendants from violating the substantive and procedural requirements of the Industrial Stormwater Permit at the Facility;

e. Order Defendants to pay civil penalties in accord with CWA Section 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1 - 19.4 (2016).

f. Award Plaintiff its costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA, 33 U.S.C. § 1365(d); and

g. Award such other relief as this Court may deem appropriate.

## IX. **DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS**

Based on EcoRights' knowledge to date, pursuant to Civil Local Rule 3-16, the undersigned certifies that, as of this date, other than the named parties, there is no such interest to report.

Dated: July 18, 2017                              ENVIRONMENTAL ADVOCATES

Jodene Isaacs, Attorney for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION