# EXHIBIT A

Christopher Sproul (State Bar No. 126398)
Jodene Isaacs (State Bar No. 226895)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376, (510) 847-3467
Facsimile: (415) 358-5695
Email:  csproul@enviroadvocates.com
Email:  jisaacs@enviroadvocates.com

Fredric Evenson (State Bar No. 198059)
ECOLOGY LAW CENTER
P.O. Box 1000
Santa Cruz, CA 95061
Telephone: (831) 454-8216
Email: evenson@ecologylaw.com

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION,<br><br>                    Plaintiff,<br><br>          v.<br><br>MAD RIVER LUMBER, LLC and TAP VENTURES, LLC,<br><br>                    Defendants. | Civil Case No.  1:17-cv-04031-RMI<br><br>[PROPOSED] CONSENT AGREEMENT<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et. seq.*) |

**WHEREAS**, Plaintiff Ecological Rights Foundation ("EcoRights") is a non-profit public benefit corporation dedicated to the preservation, protection, and restoration of the environment, the wildlife and the natural resources of all waters of California, including the Mad River;

**WHEREAS**, Defendant Mad River Lumber, LLC ("Mad River Lumber") operates the log deck facility located on Humboldt County Assessor's Parcel Number ("APN") 507-081-051, Arcata, California ("Facility") which provides outdoor storage for unprocessed wood logs that are then transported to Mad River Lumber's mill facility ;

**WHEREAS**, Defendant Tap Ventures, LLC ("Tap Ventures") is the owner of the property on which the Facility is located ("Property").  Defendants Mad River Lumber and Tap Ventures may sometimes be collectively referred to herein as "Defendants."  Plaintiff and Defendants will sometimes be collectively referred to herein as "Parties" and individually as "Party."

**WHEREAS,** discharges from the Facility are presently regulated by the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 adopted by the California State Water Resources Control Board ("SWRCB") via Water Quality Order No. 2014-0057-DWQ ("2015 Industrial Storm Water Permit"), which became effective July 1, 2015, and Plaintiff alleges that Defendants were previously regulated by the previous version of the Industrial Stormwater Permit adopted by Water Quality Order No. 97-03-DWQ ("1997 Industrial Storm Water Permit").  Discharges from the Facility are further regulated by the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.* ("Clean Water Act" or "CWA");

**WHEREAS,** on May 11, 2017, EcoRights provided written notice of alleged violations of the CWA and the Endangered Species Act, 16 U.S.C. §§ 1531, *et seq.* ("ESA") by Defendants and of EcoRights' intention to file suit against Mad River Lumber to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the SWRCB; the Executive Officer of the California Regional Water Quality Control Board, Region 3 ("Regional Board"); the U.S. Attorney General, and the Defendants ("Notice Letter") as required by the CWA, 33 U.S.C. § 1365(b)(1)(A) for their alleged failure to obtain authorization to discharge pollutants into waters of the United States;

1    **WHEREAS**, on July 13, 2017, Mad River Lumber submitted a Notice of Intent to be covered

2    by the 2015 Industrial Storm Water Permit and thereby obtained authorization to discharge

3    stormwater from the Facility**;**

4    **WHEREAS**, on July 18, 2017, Plaintiff filed a complaint against Defendants in the United

5    States District Court, Northern District of California (Case No. 17-cv-04031) alleging ongoing

6    violations of the CWA ( "Complaint");

7    **WHEREAS**, in July 2017, Mad River Lumber informed EcoRights that it was preparing a

8    set of advanced Best Management Practices ("BMPs") that it planned to implement at the Facility

9    and, on August 17, 2017, Mad River Lumber transmitted to EcoRights a Stormwater Project

10    Proposal ("Proposal") containing new short-term and long-term BMPs that it planned to implement

11    at the Facility. This Proposal has been agreed upon by the Parties as the centerpiece of this consent

12    agreement;

13    **WHEREAS**, Defendants deny any and all allegations that they have violated the CWA or

14    any Industrial Stormwater Permit issued at any time by the SWRCB, or the ESA, and maintain that

15    Mad River Lumber's operations are in compliance with the requirements of the CWA, the 2015

16    Industrial Storm Water Permit and 1997 Industrial Storm Water Permit; Defendants deny any and

17    all allegations in the Notice Letter and Complaint, and deny that they have any liability whatsoever

18    to EcoRights;

19    **WHEREAS**, this Consent Agreement shall be submitted to the EPA and United States

20    Department of Justice ("DOJ") for the statutory review period pursuant to 33 U.S.C. § 1365(c) and

21    40 C.F.R. § 135.5;

22    **WHEREAS**, Plaintiff and Defendants have agreed that it is in the Parties' mutual interest to

23    enter into a Consent Agreement setting forth terms and conditions appropriate to resolving the

24    allegations set forth in the Complaint without further proceedings and without any admission of

25    liability on the part of the Defendants; and

26    **NOW, THEREFORE, IT IS HEREBY STIPULATED BETWEEN THE PARTIES**

27    **AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

28

## I.    **GENERAL OBJECTIVES**

1.    One objective of this Consent Agreement is to ensure that Mad River Lumber continues to use, implement, and improve ways, means, and methods to prevent or reduce the discharge of pollutants in storm water runoff from the Facility.

2.    An additional objective is to further the goals and objectives of the CWA.

## II.    **DEFINITIONS**

3.    Unless otherwise expressly defined herein, terms used in this Consent Agreement which are defined in the CWA or in regulations or rules promulgated under the CWA have the meaning assigned to them in the statutes or regulations or rules. Whenever terms listed below are used in this Consent Agreement, the following definitions apply:

"Best Management Practices (BMPs)" shall be defined as set forth in the Glossary to the 2015 Industrial Stormwater Permit.

"Consent Agreement" means this Consent Agreement and any attachments or documents incorporated by reference.

"Day" means a calendar day. In computing any period of time under this Consent Agreement, where the last day of such period is a Saturday, Sunday, or federal or state Holiday, the period runs until the close of business on the next day that is not a Saturday, Sunday, or federal or state Holiday.

"Dry Season" means the five-month period beginning May 1st of any given year and ending September 30th of the same year.

"Effective Date means the effective date of this Consent Agreement as defined in Paragraph 66 of this Consent Agreement.

"Major Storm Events" means all storm events forecast to generate more than 1.0 inches in a 24-hour period.

"Monitoring Implementation Plan (MIP)" means planning documents included in the Storm Water Pollution Prevention Plan.

"Storm Water Pollution Prevention Plan (SWPPP)" means the site-specific SWPPP required by Section X of the 2015 Industrial Storm Water Permit.

"Numeric Action Levels (NALs)" means pollutant concentration levels used to evaluate whether best management practices are effective and if additional measures are necessary to control pollutants. NALs are not effluent limits. The exceedance of an NAL is not a violation of the 2015 Industrial Storm Water Permit.

"Wet Season" means the seven-month period beginning October 1st of any given year and ending April 30th of the following year.

## III.   JURISDICTION AND VENUE

4.   For purposes of this Consent Agreement, the Parties stipulate this Court has jurisdiction over the subject matter of the claims asserted by Plaintiff pursuant to CWA section 505(a), 33 U.S.C. § 1365(a), 28 U.S.C. §§ 1331, 1355, and 1367 and that venue is proper in this judicial district pursuant to CWA sections 309(b), 505(c), 33 U.S.C. §§ 1319(b), 1365(c), and 28 U.S.C. §§ 1391(b) and (c). The Parties waive any and all objections that they may have to the Court's jurisdiction to enter and enforce this Consent Agreement. Defendants do not contest for purposes of this Consent Agreement that the Complaint states claims upon which relief may be granted pursuant to CWA section 505, 33 U.S.C. § 1365 and that Plaintiff has standing to bring this action.

## IV.   EFFECT OF CONSENT AGREEMENT/RELEASE OF CLAIMS

5.   Compliance with Laws. This Consent Agreement is neither a permit nor a modification of existing permits under any federal, state, or local law and in no way relieves Mad River Lumber of its responsibilities to comply with all applicable federal, state and local laws and regulations.

6.   Claim Resolution. Defendants' compliance with this Consent Agreement, including all monetary payments due under this Consent Agreement and the completion of all activities required pursuant to this Consent Agreement, resolves Plaintiff's claims for the violations alleged against Defendants in the Notice Letter and/or Complaint.

7.    <u>No Admission</u>. Nothing in this Consent Agreement shall be construed as an admission by Defendants, and does not intend to imply any admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Agreement be construed as an admission by Defendants of any fact, finding, conclusion, issue of law, or violation of law.

8.    <u>Plaintiff's Release</u>:  Upon the Effective Date of this Consent Agreement, Ecological Rights Foundation, on its own behalf and on behalf of its officers, employees, subsidiaries, successors and assigns, directors, and its agents or representatives that have the authority to speak on behalf of the Ecological Rights Foundation's board of directors, releases and forever discharges Mad River Lumber and Tap Ventures (and their respective members, owners, officers, directors, employees, agents, attorneys, representatives, affiliated companies, parents, subsidiaries, predecessors, successors and assigns, past and present) from, and waives all claims, whether known or unknown, anticipated or not anticipated, actual or contingent, suspected or unsuspected, for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed in this legal action, or which was alleged in the Notice Letter, including but not limited to the alleged failure of Defendants to comply with the Clean Water Act (33 U.S.C. §§ 1251, *et seq*.), the Porter-Cologne Water Quality Control Act (Water Code §§ 13000, *et seq*.) including the 2015 Industrial Storm Water Permit and its predecessors, and the Endangered Species Act (16 U.S.C, §§ 1531, *et seq*.) at the Facility, up to the Termination Date of this Consent Agreement as provided in Paragraph 67.  This release includes a release, and covenant not to sue, for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts and others), costs, expenses or any other sum incurred or claimed or which could have been claimed with respect to any Mad River Lumber or Tap Ventures  activities at the Facility or  Property in alleged violation of the Clean Water Act or the Porter-Cologne Water Quality Control Act, including the 2015 Industrial Storm Water Permit or any successor General Permit, or the Endangered Species Act, that may arise during the term of this Consent Agreement up to its termination. All of the above-referenced potential, actual or future claims shall hereafter be collectively referred to as the

"Released Claims."

9.   <u>Defendants' Release</u>:  Upon the Effective Date of this Consent Agreement, Defendants, each on their own behalfs and on behalf of their current and former members, owners, officers, directors, employees, members, and each of their successors and assigns, and their agents, attorneys, and other representatives, release Plaintiff (and its current and former officers, directors, employees,  subsidiaries, and each of their successors and assigns, and its agents and representatives that have the authority to speak on behalf of the Ecological Rights Foundation's board of directors) from, and waives all claims which arise from or pertain to, this action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to Plaintiff's Notice Letter and Complaint up to the Effective Date.

10.   <u>Unknown Claims</u>. Mad River Lumber and Tap Ventures, on the one hand, and EcoRights, on its own behalf and on behalf of its subsidiaries, successors, directors, officers, and employees, on the other hand, acknowledge that they may hereafter discover facts in addition to or different from those which they now know or believe to be true with respect to the releases set forth in this Consent Agreement, and that they may have sustained damages, costs or expenses that are presently unknown and that relate to the releases set forth in this Consent Agreement. The Parties acknowledge, however, that they have negotiated, agreed upon, and entered into this Consent Agreement in light of such possibilities. The Parties agree that the foregoing releases shall be effective as a bar to any and all actions, attorneys' fees, damages, losses, civil penalties, claims, liabilities and demands of whatever character, nature and kind, known or unknown, suspected or unsuspected, hereinabove specified to be so barred. In furtherance of this intention, the Parties waive any and all rights which they may have under state or federal statute or common law principles that would otherwise limited the effect of this Consent Agreement to claims known or suspected at the date on which the Parties hereto execute this Settlement Agreement. Specifically, the Parties expressly waive any and all rights that they may have under Section 1542 of the California Civil Code, which provides as follows:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known to him must have materially affected his settlement with the debtor.

11.    <u>Complaint Dismissal</u>. To accomplish dismissal of the Complaint and to ensure that the Court retains subject matter jurisdiction to enforce the Consent Agreement, the Parties will file with the Court a proposed form of Stipulation and Order which shall provide: (A) for dismissal of the Complaint and all claims therein with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2); and (B) that the Court shall retain and have jurisdiction over the Parties with respect to enforcement of the Consent Agreement.

12.    <u>Retention of Federal Jurisdiction</u>. The United States District Court for the Northern District of California shall retain and will have jurisdiction over the Parties to this Consent Agreement for the resolution of any disputes that may arise under this Consent Agreement. Each Party, on behalf of itself and its successors or assigns, expressly consents to the jurisdiction of the United States District Court for the Northern District of California for these purposes. Any Party claiming that the other Party has failed to comply, after attempting to work out disputes informally utilizing the mechanism in Paragraphs 44 or 54 may, by motion, ask the Court approving this Consent Agreement to enforce the Consent Agreement obligations through declaratory and/or injunctive relief only. The Party bringing the motion shall carry the burden of proof to demonstrate that the other Party is in breach of its Consent Agreement obligations.

13.    <u>No Admissions</u>. The Parties enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation. Nothing in this Consent Agreement shall be construed as, and Defendants expressly do not intend to imply, any admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Agreement constitute or be construed as an admission by Defendants of any fact, finding, conclusion, issue of law, or violation of law. However, this paragraph shall not diminish or otherwise affect the obligations of the Parties under this Consent Agreement.

**V.    APPLICABILITY**

14.    The provisions of this Consent Agreement apply to and bind Plaintiff and

Defendants, including any successors or assigns. The Parties certify that their undersigned representatives are fully authorized to enter into this Consent Agreement, to execute it on behalf of the Parties, and to legally bind the Parties to its terms.

15.    The Parties agree to be bound by this Consent Agreement and not to contest its validity in any subsequent proceeding to implement or enforce its terms.

16.    If and when the Property or the Facility are no longer used by Defendants or by any of their successors or assigns for a log deck or other industrial purposes causing a discharge covered by the 2015 Industrial Permit or any successor industrial permit, and Mad River Lumber or its successors or assigns submits a Notice of Termination to the Regional Board in conformance with Section II(C) of the 2015 Industrial General Permit (or any successor provision), the obligations of this Consent Agreement shall automatically terminate.

17.    The terms of this Consent Agreement shall inure to the benefit of, and be binding upon, the successors and assigns of the Parties.  This Consent Agreement shall not in any way be interpreted as any restriction on or impediment to the sale, transfer, loan or other business transaction for or relating to the Property or the business of Mad River Lumber.  However, any successor or assign of Defendants' interests in the Property or the business shall be subject to the terms of this Consent Agreement until its termination date if such successor or assign operates the Facility as a log deck facility or other industrial purposes causing a discharge covered by the 2015 Industrial Permit or any successor industrial permit.

18.    Except as otherwise provided in this Part, the sale or transfer of ownership or operation of any portion of the Facility does not relieve Mad River Lumber of its obligations under this Consent Agreement.  Not later than thirty (30) days prior to the sale or transfer of ownership or operation of any portion of the Facility, Mad River Lumber shall give written notice of this Consent Agreement to each purchaser or successor in interest and shall obtain a letter from them agreeing to perform the obligations in this Consent Agreement.  Mad River Lumber shall also give written notification to Plaintiff, in accordance with Part XV (NOTICES AND SUBMISSIONS), of the anticipated sale or transfer of ownership or operation of the Facility, along with a copy of this letter,

at least thirty (30) days prior to the scheduled date of such sale or transfer. If the transfer of ownership or operation is completed, the obligations under this Consent Agreement shall be transferred to the new owner or operator so long as it files a Notice of Intent for coverage under the 2015 Industrial General Permit and Defendants shall thereafter be released from liability.

**VI.    INJUNCTIVE MEASURES**

**A.    SWPPP Update**

19.    <u>Site Mapping.</u> Not later than ninety (90) days after the Effective Date, Mad River Lumber shall update as necessary the Site Map for the Facility SWPPP, including: (A) In addition to conforming to each of the requirements set forth in Attachment D, section F(2) of the 2015 Industrial Stormwater Permit the Site Map shall also provide a detailed inset which details the location of the Aqua Dam barrier discussed in Paragraph 21 below and identifies the location and type of impenetrable materials to be installed at the foot of the barrier, the location of any other berms in the vicinity, and the existing discharge channel; and (B) to the extent not already implemented, identify on the Site Map for the SWPPP Facility each location at which storm water and non-storm water are known to be discharged or may potentially be discharged ("Designated Discharge Points or Designated Discharge Locations") to waters of the United States.  Each Designated Discharge Point or Designated Discharge Location shall be numbered and clearly labeled on the Site Map and described within the SWPPP.

20.    <u>BMP Update</u>. Within ninety (90) days of the Effective Date, Mad River Lumber shall incorporate into the Facility SWPPP the stormwater pollution control measures identified in Paragraph 21 herein.

**B.    Storm Water Pollution Control Measures**

21.    In addition to maintaining the current BMPs at the Facility and continuing to comply with the BMP requirements of the 2015 Industrial Stormwater Permit, Defendant Mad River Lumber plans to and shall install the following advanced BMPs at the Facility:

(A)    By December 15, 2017, Mad River Lumber shall install an improved rolling dip at the Facility entry to reduce the amount of stormwater run-on entering the Site. The rolling dip

1   shall be regraded so that is wider, deeper, and connected to the vegetated swale that borders the

2   western edge of the property.

3           (B)    By November 1, 2017, Mad River Lumber shall designate a temporary 100-

4   foot setback from the edge of the southeastern property line and shall not conduct any activities

5   within the setback so as to reduce soil disturbance adjacent to the stormwater discharge location

6   until the long-term BMPs below are implemented.

7           (C)    By November 15, 2017, Defendant Mad River Lumber shall install an Aqua

8   Dam barrier adjacent to the current Designated Discharge Point to reduce or prevent the flow of

9   stormwater into Janes Creek. The Aqua Dam barrier shall be approximately 200 linear feet in

10   length and up to four feet tall in height, although these dimensions may be modified as necessary to

11   conform to actual field conditions. Prior to installation of the Aqua Dam barrier, the ground surface

12   beneath the dam footprint will be modified to include impermeable materials to prevent seepage.

13   These impermeable materials may include hydrophobic materials that will help to seal the

14   connection between the Aqua Dam and the ground.

15       **C.**    **Retention Basin**

16       22.    The Parties agree that, pursuant to the Proposal, Mad River Lumber will install a

17   stormwater retention basin on the Property beginning in or about Fall 2018 as described in its

18   Proposal.  This retention basin will be designed to capture all industrial stormwater generated at the

19   Facility and, once installed, likely would cease any industrial stormwater discharges from the

20   Property to Janes Creek. Mad River Lumber will take the following steps to implement this BMP:

21           (A)    Mad River Lumber shall commission site hydrology, soil profile and any

22   necessary engineering studies it believes it needs to inform the design of the retention basin.  Mad

23   River Lumber will provide EcoRights with copies of these studies.

24           (B)    Mad River Lumber shall then prepare a conceptual design plan for the

25   retention basin and will provide it to EcoRights for review and comment, which EcoRights shall

26   provide within 30 days of receipt of the plan.  Mad River Lumber will discuss and consider any

27   comments by EcoRights in a good faith attempt to reach consensus, but will have full discretion on

28

whether or not to incorporate them into the retention basin plan provided that the plan meets Section XX.C and Section II.S of the Fact Sheet of the 2015 Industrial Storm Water Permit or, alternatively, Section X.H.6.a of the 2015 Industrial Storm Water Permit.

(C)    After the conceptual design plan has been reviewed, Mad River Lumber will begin the permit application and construction bid process.  Mad River Lumber's goal is to install the retention basin as soon as possible after receiving the necessary permits, preferably by November 15, 2018.

(D)    If Mad River is not able to construct the retention basin by the Fall 2018, it shall continue to utilize the minimum BMPs identified in Section VI(B) for the 2018-19 rainy season and continue visual monitoring of the Designated Discharge Locations as described in Paragraphs 32-33.

(E)    Within ten days after the retention basin has been installed, Mad River Lumber will provide notice to EcoRights of the installation and EcoRights has the option to inspect the installed facility.  Mad River Lumber will thereafter operate and maintain the retention basin.

### D.    Alternative Long Term Structural BMPs

23.    If Mad River Lumber decides that a retention basin is not technologically or otherwise feasible at this location, Mad River Lumber shall prepare and provide to Plaintiff, by July 31, 2018, its Long Term Structural BMP Plan ("Long Term Plan") for developing BMPs at the Facility capable of providing treatment to all storm water discharges to a level commensurate with Best Available Technology Economically Achievable ("BAT") and the Best Conventional Pollutant Control Technology ("BCT").

24.    The Long Term Plan shall include the engineering and design plans necessary for the installation of a different structural BMP or BMPs that meet the requirements of Paragraph 23 herein. Further, should pentachlorophenol or tannins and lignins be detected in Mad River Lumber's stormwater discharges pursuant to Table 1 Reporting Limits, the Long Term Plan shall include consideration of installing or improving treatment systems that would provide more effective treatment of storm water prior to discharge, such as a fixed-bed filter system or other improved filter

system.

25.    The Long Term Plan shall include engineering evaluations prepared by a licensed principal engineer and include evaluations of site hydrology, lithology, and other relevant factors necessary to scale and construct this BMP.

26.    The Long Term Plan shall entail a proposed timeline for installation of this BMP and detail all state and local permits needed to install either option.

27.    Long Term Plan Review:  Plaintiff shall have thirty (30) days upon receipt of Defendants' Long Term Plan to provide Defendants with comments. Within thirty (30) days of Defendants' receipt of Plaintiff's comments on the Long Term Plan, Defendants shall accept and incorporate Plaintiff's comments into the Plan, or shall provide Plaintiff with a written explanation if Defendants are declining to develop and/or implement any of Plaintiff's recommendations.  Any disputes as to the adequacy of the Long Term Plan shall be resolved pursuant to the Dispute Resolution provisions of Part XII (DISPUTE RESOLUTION).

28.    Long Term Plan Approval Process:  Mad River Lumber shall diligently endeavor to get approval for the BMPs set forth in the Long Term Plan from any necessary agencies which may include the City of Arcata, the North Coast Regional Water Quality Control Board, the State Water Resources Control Board, and any other agency whose approval is determined necessary as expeditiously as possible. Mad River Lumber shall keep Plaintiff informed as to the status of all approvals by providing an Approval Process Progress Report to be sent quarterly.  The Approval Process Reports shall indicate all actions Mad River Lumber has initially taken or has taken since the last report, including any communications or correspondence to or from Mad River Lumber and local or state agencies involved in the approval process for implementing Long Term Plan or related actions.  Mad River Lumber shall continue quarterly updates up to and including the date on which all components of the Long Term Plan are approved by applicable agencies.

29.    Long Term Plan Implementation:  Upon receiving all required local, state and other approvals, Mad River Lumber shall construct the structural requirements necessary to fully implement the Long Term Plan in accordance with the timelines contained in the Plan.  Mad River

1    Lumber shall thereafter properly operate and maintain the treatment and/or storm water retention

2    systems.

3    **VII.    SAMPLING, MONITORING, INSPECTION & REPORTING**

4         **A.    Sampling Program**

5         30.    While Mad River Lumber is investigating and/or implementing long term structural

6    BMPs to manage the Facility's stormwater, Mad River Lumber shall continue to comply with all

7    monitoring and reporting requirements required by the 2015 Industrial Storm Water Permit.

8         31.    Mad River Lumber shall analyze each storm water sample collected per the 2015

9    Industrial Storm Water Permit and each of the parameters listed on Table 1. Mad River Lumber shall

10   update its SWPPP and Sampling Log Sheets to include the parameters set forth in Table 1.

11        **B.    Visual Observations**

12        32.    <u>Wet Weather Visual Observations</u>:  During the life of this Consent Agreement,

13   Defendants shall conduct and record visual observations at all Designated Discharge Locations twice

14   a month during or after Major Storm Events (if two such events occur in that month) between

15   November 1 and April 30th if the events occur during normal facility operating hours and are

16   preceeded by two days with no rain. Defendants shall conduct and record visual observations during

17   normal facility operating hours at all potential discharge locations on the perimeter of the Facility to

18   determine if discharge of storm water is occurring or did occur during or after a Major Storm Event.

19   Along with the visual observations, Defendants shall document an estimate of the length of the rain

20   event, and the amount of precipitation from the event. In addition, Defendants shall conduct

21   informal weekly observations of the Aqua Dam to determine if it is operating as expected.

22        33.    During such wet weather visual observations, Mad River Lumber employees shall

23   also monitor the presence of discolored or turbid storm water discharges.  Defendants shall take

24   representative photographs of storm water discharges during observed Major Storm Events,

25   including photographs of any discolored or turbid storm water discharges or visually observable oil

26   sheens. Mad River Lumber shall include these photographs with date, time, location, and any notes

27   recorded with the visual observations in the Annual Reports provided to Plaintiff in accordance with

28

Paragraph 39.

34.    <u>Dry Weather Visual Observations</u>:  At least once per month between May 1 and October 31, designated Mad River Lumber employees shall conduct dry weather visual inspections of the Facility. Such inspections shall include driveways, outdoor storage areas, and all Industrial Activity Areas. All Designated Discharge Locations shall also be inspected for the accumulation of dust, sediment, sand, grit, oily substances, oily sheens upon any standing water, and other materials associated with operations at the Facility. Such inspections shall further include observations of all storm water BMPs at the Facility to ensure that operational BMPs are being implemented, that structural BMPs are in good condition or working order, and that BMPs have been effective in producing clean conditions at the Facility (*e.g.*, an absence of oil stains on paved or unpaved surfaces, minimize metal debris or other debris on paved or unpaved surfaces, minimized oil staining, or release of metal or other debris or grit in storm water conveyance structures).

35.    During such dry weather visual inspections, appropriately trained, designated employees shall photographically document their visual observations of the status of BMPs.  Mad River Lumber shall include these photographs in annual reports provided to Plaintiff in accordance with Paragraph 39.

**C.    Compliance Monitoring**

36.    <u>Site Inspections</u>.  Plaintiff and its representatives may conduct up to two site inspections per year at the Facility during the life of this Consent Agreement.  The site inspections shall occur during normal business hours and Plaintiff shall provide Defendants with (72) hours' notice prior to each site inspection.

37.    During the site inspections, Plaintiff and/or its representatives shall be allowed access to the Facility's SWPPP, MIP, and other monitoring records, reports, and sampling data for the Mad River Lumber Facility. During the site inspections, Plaintiff and/or its representatives may collect samples of discharges from the Facility.  A certified California laboratory shall analyze storm water samples collected by Plaintiff and copies of the lab reports shall be provided to Defendants within five (5) business days of receipt. The samples shall be split and one half provided to Defendants so

as to allow Defendants to have their own certified California laboratory analyze the samples, in which case Defendants shall provide the laboratory results to Plaintiff within five (5) business days of receipt.

### D.    Inspection Logs

38.    During the life of this Consent Agreement, Mad River Lumber shall keep contemporaneous logs documenting the performance of any maintenance activities performed pursuant to the Facility's SWPPP and inspection activity performed pursuant to Paragraphs 32-35 with sufficient to describe the completed activity and any pertinent information that the activity yielded (*e.g.*, whether BMPs are in adequate condition and whether the Facility is free of oil, debris, or other conditions likely to lead to pollutant loading in storm water discharges).

### E.    Reporting

39.    Annual Reporting.  During the life of this Consent Agreement, Mad River Lumber shall provide Plaintiff with a copy of its Annual Report by August 1 of each year, beginning in August 2018, and provide Plaintiff with a chart or table in digital or hardcopy form that summarizes the results of all the samples and includes comparison to the applicable analysis contained in Table 1 below. The summary chart shall consistently present the sample summaries in micrograms per liter for all of the parameters for which concentration values are provided.  Mad River Lumber shall also provide by this date field notes documenting visual inspections at the Facility, and cleaning, maintenance, and inspection logs prepared pursuant to Paragraphs 32-35.

40.    Quarterly Reporting.  During the life of this Consent Agreement, Mad River Lumber shall provide Plaintiff on a quarterly calendar basis, within 30 days after the end of the quarter, with all documents pertaining to the 2015 Industrial Storm Water Permit submitted to or received from any state or local agency during that quarter concerning the Facility and the permitting for the Retention Basin or Long Term BMP Plan implementation, including all documents and reports submitted to the Regional Board as required by the 2015 Industrial Storm Water Permit for that quarter. The first quarterly report shall be due on April 30, 2018.

## VIII.    MONITORING IMPLEMENTATION PLANS

41.    Within ninety (90) days after the Effective Date of this Consent Agreement, Defendants shall revise their MIP to the extent necessary to:

(A)    Incorporate the requirements of the 2015 Industrial Storm Water Permit, and this Consent Agreement;

(B)    Describe all BMPs and how they will be operated and/or maintained;

(C)    Describe where and when storm samples are to be collected and explain why the sample points are representative of offsite discharge and include a checklist that must be used by trained Facility personnel when conducting the storm water sampling required under the 2015 Industrial Storm Water Permit and/or under this Consent Agreement; and

(D)    Describe where and when visual inspections of the Facility are to be performed and include a visual inspection checklist that must be used by trained Facility personnel when conducting the visual observations required under the 2015 Industrial Storm Water Permit and/or under this Consent Agreement.

42.    Commenting on the Initial SWPPP and MIP Revisions.  The Defendants shall submit the SWPPP and MIP revisions made within the first 90 days after the Effective Date to Plaintiff for review and comment as soon as it is completed, but in any event no later than thirty (30) days after its completion.    Plaintiff shall provide comments, if any, to the Defendants within thirty (30) days of receipt of the SWPPP and MIP.  The Defendants shall incorporate Plaintiff's comments into the SWPPP and MIP or shall justify in writing why any comment is not incorporated within thirty (30) days of receiving Plaintiff's comments.

43.    Additional Revisions to SWPPP and MIP.  The Defendants shall revise the SWPPP and MIP if there are any changes in the Facility's operations, including but not limited to changes to storm water discharge point(s) or changes or additions to the BMPs at the Facility.  The Defendants shall submit any revised SWPPP and MIP to Plaintiff for review and comment within fifteen (15) days of completion.  Plaintiff shall provide comments, if any, to the Defendants within thirty (30) days of receipt of any revised SWPPP and MIP.  The Defendants shall incorporate Plaintiff's

comments into any revised SWPPP and MIP, or shall justify in writing why any comment is not incorporated within thirty (30) days of receiving comments.

44.     Any disputes as to the adequacy of the initial or any subsequent SWPPP and MIP revisions shall be resolved as follows.  If Plaintiff believes that the SWPPP or MIP revision is inadequate, the Parties shall hold a meeting or phone conference to confer within twenty (20) calendar days of receiving written notification from Plaintiff requesting for a meeting or phone conference.  The Parties can mutually agree to extend this deadline. This notification shall explicitly state the nature, underlying facts and legal grounds for the dispute or alleged breach.  At this meeting, the Parties shall discuss the merits of the dispute, and they shall seek to develop a mutually agreed-upon plan, including implementation dates, to resolve the dispute.  If the Parties cannot resolve their differences relating to the SWPPP or MIP revisions, one expert for Plaintiff and one expert for Defendants shall meet and use their best efforts to reach a compromise that they present to the Parties which will then be incorporated into the SWPPP or MIP.  If the experts cannot reach a compromise, then the Parties may pursue the federal court process that is set forth beginning with the fifth sentence in Paragraph 54 herein.

**IX.     EXTENSION OF DEADLINES**

45.     Extension of Time.  Except as otherwise noted, Defendants shall contact Plaintiff to request an extension of any deadline in this Consent Agreement, if necessary, to implement any of the requirements contained therein.  However, Defendants may not be allowed to request any extension of time for the completion of the monetary payments for Supplemental Environmental Project Funding, litigation costs and fees, and Compliance Monitoring Funds.  Plaintiff's consent to Defendants' requested extension shall not be unreasonably withheld.

**X.      MITIGATION, FEES, AND COSTS**

46.     Supplemental Environmental Project Funding:  Within 15 days of the Effective Date, Mad River Lumber shall donate the sum of seventeen thousand five hundred dollars ($17,500) to the Rose Foundation for Communities and the Environment, for projects relating to the reduction, prevention or mitigation of, or research on, the effects of discharges of pollutants to the Janes Creek

watershed or for research projects designed to advance environmental restoration in the Janes Creek watershed.

47.     <u>Reimbursement of Fees and Costs</u>:  Mad River Lumber shall reimburse Plaintiff in the amount of thirty-three thousand dollars ($33,000) to help defray Plaintiff's investigation fees and costs, expert fees and costs and reasonable attorneys' fees incurred as a result of investigating the activities at the Facility, bringing these matters to Mad River Lumber's attention, and negotiating a resolution of this action in the public interest. Payment shall be made payable to Ecology Law Center's Attorney-Client Trust Account within fifteen (15) days of the Effective Date.

48.     <u>Compliance Monitoring Funds</u>: Within 15 days of the Effective Date, Mad River Lumber shall pay to Plaintiff five thousand dollars ($5,000) for costs and fees associated with monitoring Mad River Lumber's compliance with this Consent Agreement. Monitoring activities include site inspections, review of water quality sampling reports, review of annual reports, discussion with representatives of Mad River Lumber concerning implementation of the Long Term Plan, water quality sampling, etc.

49.     <u>Supplemental Compliance Monitoring Funds</u>: If Mad River Lumber is required to submit a Long Term Plan in accordance with Paragraph 23, it shall concurrently pay one thousand five hundred dollars ($1,500) for EcoRights' review of the Long Term Plan. This Long Term Plan Review payment shall be made payable to Ecology Law Center's Attorney Client Trust Account concurrently with the submittal of the Long Term Plan.

## XI.    **STIPULATED PAYMENTS**

50.     In the event Mad River Lumber fails to submit to Plaintiff any document, report or other communication required under Paragraphs 19, 20 and 41 (initial revision of SWPPP and MIP), Paragraph 23 (Long Term Plan), Paragraph 39 (Annual Report), and Paragraph 40 (submittal of Quarterly Report) of this Agreement, Plaintiff shall provide Defendants with a written notice reminding them of this obligation. If Defendants do not cure this submittal requirement for a particular submittal within of two weeks of receiving the written notice, Mad River Lumber shall make a one-time late payment of one thousand dollars ($1,000) on the fifteenth (15th) day after

receipt of the reminder notice. This late payment shall not excuse performance of this obligation.

51.    In the event Mad River Lumber fails to submit to Plaintiff any document, report or other communication required under Paragraph 18 (change in ownership), Paragraph 22(B) (Retention Basin Plan submittal), or Paragraph 43 (SWPPP and MIP subsequent revisions), Mad River Lumber shall incur a late payment of five hundred dollars ($500) per day commencing on the sixteenth (16th) day after the date by which the measure was to be completed or implemented.

52.    If Mad River Lumber fails to submit to any payments required under Paragraphs 46-49 of this Consent Decree within 15 days of the date due, Mad River Lumber shall incur a five hundred dollar ($500)-per-day payment for each day that Mad River Lumber's payment continues to be late.

53.    Any stipulated payments pursuant to this Part shall be paid to the Rose Foundation for Communities and the Environment within fourteen (14) days of the event that precipitated the Stipulated Payment liability. Stipulated payments shall be used for projects relating to the reduction, prevention or mitigation of, or research on, the effects of discharges of pollutants to the Janes Creek watershed, or for research projects designed to advance environmental restoration in the Janes Creek watershed. Mad River Lumber shall send Plaintiff notice of any such stipulated payments within seven (7) days of tendering such payments.

## XII.    DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT

54.    Dispute Resolution Process:  If a dispute arises under this Consent Agreement, or if any Party believes that a breach of this Consent Agreement has occurred, the Parties shall hold a meeting or phone conference to confer within twenty (20) calendar days of receiving written notification from the other Party of a request for a meeting or phone conference.  The Parties can mutually agree to extend this deadline.  This notification shall explicitly state the nature, underlying facts and legal grounds for the dispute or alleged breach.  At this meeting, the Parties shall discuss the merits of the dispute and whether a violation has occurred, and they shall seek to develop a mutually agreed-upon plan, including implementation dates, to resolve the alleged violation or dispute.  If the Parties fail to meet and confer or the meeting/conference does not resolve the issue,

and if at least seven (7) days have passed after the meet and confer occurred or should have occurred, a Party may request a settlement conference before the Magistrate Judge assigned to this matter.  If the settlement conference is not successful in resolving the dispute, or a settlement conference is not obtained, any Party shall be entitled to all rights and remedies under the law, including bringing a motion before the United States District Court of California for the Northern District of California, which shall retain jurisdiction over the action for the limited purposes of enforcement of the terms of this Consent Agreement.  The Parties agree not to object to an expedited hearing schedule on any Dispute Resolution motion if one of the Parties requests one.

55.    Burden of Proof:  In the event of any disagreement or dispute between Plaintiff and Defendants over the necessity or appropriateness of implementing any particular BMP or set of BMPs, including in any proceeding brought to enforce the terms of this Consent Agreement, the moving party shall bear the burden of demonstrating that the other Party or Parties have breached the Consent Agreement by their failure to take the identified action.

56.    Litigation Costs and Fees:  The Parties shall be entitled to seek litigation costs and fees incurred in conducting a meet and confer or otherwise addressing and/or resolving any dispute, including an alleged breach of this Consent Agreement, in accord with the standard established by Section 505 of the Clean Water Act, 33 U.S.C. § 1365, and case law interpreting that standard.

**XIII.    NOTICES AND SUBMISSIONS**

57.    Except as otherwise expressly provided in this Consent Agreement, whenever under the terms of this Consent Agreement notice is required to be given or a report or other document is required to be forwarded by one Party to another, it shall be sent to the following individuals as electronic computer files and first-class mail at the e-mail and street addresses specified below.  Any change in the individuals designated by either Party must be made in writing to the other Parties. Notice shall be deemed to be given and received on the date received by e-mail transmission, if such notice is given by such means to all recipients between 9:00 a.m. and 5:00 p.m. Pacific Standard time ("PST") or Pacific Daylight Time (PDT), whichever is applicable, on a business weekday.  If notice is given by e-mail transmission after 5:00 p.m. PST or PDT on a weekday or anytime on a

weekend day, notice shall be deemed received on the next succeeding weekday.

Notices or documents for Plaintiff:

>     Fredric Evenson
>     P.O. Box 1000
>     Santa Cruz, CA 95061
>     Telephone: (831) 454-8216
>     Email: evenson@ecologylaw.com

>     With a copy to:

>     Jodene Isaacs
>     Environmental Advocates
>     5135 Anza Street
>     San Francisco, California  94121
>     Email:  jisaacs@enviroadvocates.com

Notices or documents for Defendants:

>     Travis Campbell
>     Mad River Lumber, LLC
>     2935 St. Louis Road
>     Arcata, CA 95521
>     Email:  madlumber@aol.com

>     Travis Campbell
>     TAP Ventures LLC
>     2426 Sonnefelt Road
>     Bayside, CA 95524
>     Email: madlumber@aol.com

>     With a copy to:

>     Paul P. Spaulding, III, Esq.
>     Farella Braun + Martel LLC
>     235 Montgomery Street, 17th Floor
>     San Francisco, CA 94104
>     Email: sspaulding@fbm.com

## XIV.  **PAYMENTS**

58.     All payments to Plaintiff EcoRights pursuant to Paragraphs 47-49 herein shall be made by check made payable to Ecology Law Center's Attorney Client Trust Account.  Payments shall be sent via certified mail, return receipt requested, to the following address:

>     Ecology Law Center

P.O. Box 1000
Santa Cruz, CA 95061

(A)    All Supplemental Environmental Project funding pursuant to Paragraph 46 and Stipulated Payments pursuant to Paragraphs 50-52 shall be made by check payable to the Rose Foundation for Communities and the Environment.  The Rose Foundation shall transmit to Defendants a report at the end of each calendar year during the term of this Consent Agreement detailing the use of any payments provided by Defendants to it.  Such payments shall be sent via certified mail, return receipt requested, to the following address (with a copy to EcoRights that such payments have been sent):

Tim Little
Rose Foundation for Communities and the Environment
1970 Broadway, Suite 600
Oakland, California  94612-2218

## XV.    <u>MISCELLANEOUS PROVISIONS</u>

59.    <u>Execution in Counterparts</u>.  The Consent Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.

60.    <u>Severability</u>.  In the event that any of the provisions of this Consent Agreement are held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

61.    <u>Construction</u>.  The language in all parts of this Consent Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning.

62.    <u>Integrated Consent Agreement</u>.  All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Agreement are contained herein.

63.    <u>Facsimile Signatures</u>.  Signatures of the Parties transmitted by facsimile shall be deemed binding.

64.    <u>Force Majeure</u>.  No Party shall be considered to be in default or breach in the performance of any obligation specified in this Consent Agreement when a failure to perform is due to a "Force Majeure."  For purposes of this Consent Agreement, a Force Majeure event is defined as

any event arising from causes beyond the control of a Party which delays or prevents performance, including, without limitation, any act of God, war, acts of terrorism, fire, earthquake, flood, natural catastrophe, riots, restraint by court order or public authority, delay by any government agent in issuing any necessary permit or approval, or other cause beyond the Party's reasonable control. A Force Majeure event does not include inclement weather, or inability to pay. Any Party seeking to rely upon this paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and by exercise of due diligence has been unable to overcome, the Force Majeure. The Parties shall exercise due diligence to resolve and remove any Force Majeure event.

**XVI.   EFFECTIVE AND TERMINATION DATES**

65.    <u>DOJ Review</u>. Within three (3) days of the final signature of the Parties, Plaintiff shall submit this executed Consent Agreement to EPA and DOJ for a forty-five (45) -day review and comment period pursuant to CWA section 505(c)(3) and 40 C.F.R. § 135.5.  The Court shall not enter its judgment on consent until the expiration of this review and comment period.  If EPA or DOJ request or suggest revisions to this Consent Agreement or object to entry of this Consent Agreement in the form presented, the Parties shall within ten (10) days of receipt of such requested/suggested revisions meet and confer on whether to revise this Consent Agreement in accordance with the requested or suggested revisions provided by EPA or DOJ and/or to otherwise accommodate EPA or DOJ's objections. If the Parties do not mutually agree to any such revisions or modifications, the Parties shall so notify the Court and request entry of the Consent Agreement in the form drafted.  If the Court objects to entry of this Consent Agreement in the form presented, the Parties will attempt in good faith to agree to revisions of this Consent Agreement necessary so that it is acceptable to the Court.

66.    <u>Effective Date.</u> The Effective Date of this Consent Agreement shall the date on which the Court enters an order approving the Consent Agreement.

67.    <u>Termination Date</u>. This Consent Agreement shall automatically terminate upon the first of these deadlines: (1) thirty (30) days after the completion of construction of the retention basin identified in Section VI(C) if the retention basin meets the requirements of the "No Discharge

Through the Notice of Non-Applicability" ("NONA") set forth in Section XX.C of the 2015 Industrial Stormwater Permit and Section II.S of the Fact Sheet for the 2015 Industrial Stormwater Permit as embodied in the NONA submittal and certification requirements; or (2) three (3) years following the Effective Date; or (3) on the date set forth in Paragraph 16 herein.  In any of these situations, termination shall not be completed until Mad River Lumber has made all monetary payments owed under the Consent Agreement and there is no pending Dispute Resolution proceeding pursuant to the provisions of Part XII (DISPUTE RESOLUTION).  If Mad River Lumber has not made all monetary payments owed under the Consent Agreement or if there is a pending Dispute Resolution proceeding, the Consent Agreement shall be extended until Mad River Lumber has made all monetary payments owed under the Consent Agreement and all pending Dispute Resolution proceedings have been resolved.

68.     Mad River Lumber shall initiate termination by submitting certification to Plaintiff that it has satisfied the conditions of termination set forth in this Part. The Consent Agreement shall automatically terminate thirty (30) days from the Plaintiff's receipt of this notice, unless Plaintiff provides written notice to Mad River Lumber within these thirty (30) days that Plaintiff objects to the certification.  If Plaintiff disagrees with Mad River Lumber's certification, then the matter shall be subject to the Dispute Resolution provisions of Part XII (DISPUTE RESOLUTION).

IN WITNESS WHEREOF, the undersigned have executed this Consent Agreement as of the date first set forth above.

1   **IT IS SO ORDERED:**

2   Date: _____

3                              Honorable Magistrate  Robert M. Illman
                               UNITED STATES DISTRICT COURT JUDGE
4                              NORTHERN DISTRICT OF CALIFORNIA

5
    **APPROVED AS TO FORM:**
6
                                   ENVIRONMENTAL ADVOCATES
7

8   Dated: December 2- 2017         By: _____
9                                        Jodene Isaacs
                                         Attorney for Plaintiff
10

11                                 FARELLA BRAUN + MARTEL LLC

12

13  Dated: December __2017          By: _____
                                         Paul P. Spaulding, III, Esq.
14                                       Attorney for Defendants

15  **APPROVED AS TO CONTENT:**
                                   Ecological Rights Foundation
16
17  Dated: December 20 2017         By: _____, EXEC. DIR.
                                         James Lamport
18                                       Ecological Rights Foundation

19

20

21  Dated: December __2017          By: _____
                                         Travis Campbell
22                                       Mad River Lumber, LLC

23

24  Dated: December __2017          By: _____
                                         Travis Campbell
25                                       Tap Ventures, LLC

26

27

28
    Case No. 1:17-cv-04031-RMI            25
    [Proposed] Consent Agreement

1    **IT IS SO ORDERED:**

2    Date:  _____        _____
                                          Honorable Magistrate  Robert M. Illman
3                                         UNITED STATES DISTRICT COURT JUDGE
4                                         NORTHERN DISTRICT OF CALIFORNIA

5
     **APPROVED AS TO FORM:**
6                                              ENVIRONMENTAL ADVOCATES
7

8    Dated: December ___2017           By: _____
9                                           Jodene Isaacs
                                            Attorney for Plaintiff
10

11                                      FARELLA BRAUN + MARTEL LLC
12
13   Dated: December 20 2017           By: _____
14                                          Paul P. Spaulding, III, Esq.
                                            Attorney for Defendants
15   **APPROVED AS TO CONTENT:**
16
17   Dated: December ___2017           By: _____
18                                          James Lamport
                                            Ecological Rights Foundation
19
20
21   Dated: December 19 2017           By: _____
22                                          Travis Campbell
                                            Mad River Lumber, LLC
23
24   Dated: December 19 2017           By: _____
25                                          Travis Campbell
                                            Tap Ventures, LLC
26
27
28

**Table 1. Sampling Parameters for Mad River Lumber's Discharges from the Log Deck Facility**

| Contaminant | 2015 Industrial Permit NALs or Reporting Limits |
|---|---|
| Total Suspended Solids | 100 mg/L (annual) and 400 mg/L (instantaneous) |
| Oil and grease | 15 mg/L (annual) and 25 mg/L (instantaneous) |
| pH | 6.0-9.0 units |
| Tannins and Lignins | 2.1 ug/L |
| Pentachlorophenol | 7.9 ug/L |
| Dioxin TEQ (laboratory analysis only required if PCP is detected above laboratory reporting limits) | 0.014 pg/L |